UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22CR167 SEP/SPM |
| | ) | |
| MERWIN SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
AND MEMORANDUM OPINION
OF UNITED STATES MAGISTRATE JUDGE**

All pretrial matters have been referred to the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. § 636(b). Defendant Merwin Smith ("Defendant" or "Smith") is charged in

an indictment with being a felon in possession of a firearm. Smith was arrested on March 9,

2022, when police conducted a traffic stop near the 700 block of Baden Avenue and reportedly

found Smith to be in possession of a firearm and suspected fentanyl.  Smith has moved to

suppress the gun and drugs on grounds that the traffic stop, and subsequent search of his person,

violated his rights under the Fourth Amendment. *See* Doc. 39. The undersigned held an

evidentiary hearing on August 8, 2023. The United States offered testimony of St. Louis

Metropolitan Police Department (SLMPD) Detective Martinous Walls. At the time of Smith's

arrest, Detective Walls was leading an investigation of a suspected drug house located on the 700

block of Baden. He testified at the hearing about the facts and circumstances leading to Smith's

arrest. Smith offered the testimony of Richard Herndon, an Investigator with the Federal Public

Defender's Office, who investigated the scene approximately one year after Smith's arrest. Smith

also offered several documents into evidence including photographs and other images depicting

the area surrounding the suspected drug house; a recording of radio transmissions between

Detective Walls and other officers before the stop of Smith's vehicle; and video recordings of the area where Detective Walls was believed to be staked out on the day of Smith's arrest. *See* Deft. Exhs. A-J.

At the conclusion of the hearing, defense counsel requested, and was granted, time to submit additional evidence in response to Detective Walls' testimony. With leave of this Court and consent of the United States, Smith reserved the right to recall Detective Walls and to reopen the evidentiary hearing. On August 22, 2023, Smith filed a post-hearing supplement along with additional exhibits. *See* Doc. 50. Smith did not ask the Court to reopen the evidentiary hearing. Instead, he asked the Court to set a post-hearing briefing schedule. *See* Doc. 50. Post-hearing briefing concluded on November 5, 2023, and the matter is now ready for ruling.

The issue raised by Smith's suppression motion is whether Smith's seizure was justified by the level of reasonable suspicion, informed by specific articulable facts, required by the Fourth Amendment. Smith urges the Court to answer this question in the negative arguing that, at best, officers had only a generalized suspicion that criminal activity was occurring in the alley south of Baden Avenue. The United States counters this argument by contending that, based on the totality of the circumstances, Smith's seizure was supported by reasonable suspicion that he was engaging in criminal activity. *See* Docs. 43 & 62. After carefully considering the evidence of record, applicable case law, and the arguments of the parties, for the reasons discussed below I find that Smith's motion to suppress should be denied.

## FINDINGS OF FACT

### A.  *Detective Walls*

At the time of the evidentiary hearing, Detective Walls was a ten-year veteran police officer who was working in the Drug Enforcement and Intervention Unit of the SLMPD. He testified that, in early March 2022 a confidential informant ("CI"), tipped him off to drug dealing

2

in the 700 block of Baden Avenue. Detective Walls testified he was familiar with the CI and knew the CI to be reliable. The CI initially gave Detective Walls Street monikers of the individuals engaged in suspected drug trafficking. The CI also identified the block where the activity was occurring. Based on the information provided by the CI, Detective Walls identified 708 Baden as the suspected drug house and included that address in an operations plan which he disseminated to other officers.[1] *See* Deft. Exh. A.

At some point, the CI and Detective Walls met in person and, according to Detective Walls, the CI pointed out two residences on Baden where the suspected drug activity was taking place—708 and 716. The informant explained that sales occurred at those residences every day starting around 11:00 a.m. and continued through the night. The informant also advised that the sales took place at the rear of the addresses in the alley south of Baden. The informant advised that drug customers would either park on a parking pad located behind one of the addresses or stop directly in the alley behind the drug house.

On March 9, 2022, Detective Walls and his partner conducted surveillance of the alley south of Baden from a parking lot connected to the alley. Detective Walls testified that he could see 716 Baden from his location in the parking lot. Detective Walls further testified that, during his surveillance, he saw traffic patterns to 716 Baden that were consistent with what the CI told him. Walls also testified that, based on his experience and training, his observations were consistent with drug activity. Specifically, he saw one or more cars park on the parking pad behind 716 Baden and observed people going into the wooden privacy fence that surrounds 716

---

[1] The goal of the operations plan was for police to (1) monitor the target residence to look for suspected drug activity, customers or people believed to be customers going into the target residence, and (2) stop the suspected drug customers and either gaining intelligence or arresting them if needed. *See* Evid. Tr. (Doc. 49), at p.12.

Baden. He also observed that people were staying parked behind 716 Baden for very short intervals, between three to five minutes. The disheveled appearance of some of the people he saw also led him to believe he was observing individuals who were drug customers. Finally, he testified that individuals, who appeared to be acting as lookouts, were watching his unmarked police car. Based on his observations, and as reflected in the recorded radio transmissions submitted by Smith, Detective Walls directed fellow officers to begin to initiate traffic stops of some of the cars he observed stopping behind 716 Baden.

While conducting surveillance of the alley south of 716 Baden, Detective Walls saw a gold Buick drive into the alley and park behind 716 Baden. Detective Walls testified he could see that the Buick was being driven by a black female and there was an older black female in the front passenger seat. Detective Walls testified he observed a lighter-brown skin bald, black male exit the rear seat wearing a red jacket. Detective Walls testified that he observed the black male walk through the wooden privacy fence of 716 Baden and enter the rear door of the first-floor unit. The black male, who Detective Walls identified as Smith, stayed in the residence for only about three minutes. Based on his observations of the defendant, Detective Walls directed his fellow officers to initiate a traffic stop of the Buick. Detective Walls testified that officers conducted a traffic stop as he requested, and they seized a firearm and suspected narcotics.

On direct examination, Detective Walls did not testify in a narrative or chronological manner. This made it difficult to determine the exact sequence of events leading to Detective Walls' identification of 716 Baden as a suspected drug house.  However, the foregoing factual findings are predicated on Detective Walls's testimony on direct and cross examination and all reasonable inferences arising from that testimony. There was nothing about Detective Walls's demeanor in responding to questions that appeared to be intentionally misleading, evasive, or

4

suggestive of an attempt to be less than candid with the Court. Moreover, Detective Walls's testimony was partially corroborated by recorded radio transmissions and even by some of the photographs introduced into evidence by the defense. *See* Hrng. Tr. (Doc. 49), at p. 41-42 & Deft. Exh. I, at 3:57 (describing suspected drug activity being observed by Detective Walls on March 9, 2022); Deft. Exh. J (video depicting a view of the alley from a position on the parking lot that was perpendicular to the alley south of Baden from which the back entryways of 718 and 716 Baden can be seen, albeit with some obstruction from shrubs, trees, and fencing). In sum, I found Detective Walls to be a credible witness and give full credit to his testimony except as specifically noted below.

### B. *Investigator Herndon*

At the time of the evidentiary hearing, Richard Herndon was a veteran investigator with the Federal Public Defender's Office. Mr. Herndon testified that he first visited the Baden area where Smith was arrested in April 2023. On his first visit, he looked at and photographed 718 Baden, a house immediately adjacent to 716 Baden. In some photographs, 716 and 718 Baden appear to share a common backyard and appear to be enclosed by the same wooden privacy fence. *See, e.g.,* Deft. Exh. E. Investigator Herndon photographed 718 Baden because Smith told Herndon he stopped at 718 Baden on the day of his arrest. *See* Deft. Exhs. D & E.

Investigator Herndon returned to the area in June 2023 after defense counsel received Detective Walls' operations plan indicating 708 was the target house. During his June visit, Investigator Herndon focused on and photographed 708 Baden. *See* Deft. Exhs. F & G.

In August 2023, after receiving the Government's response to Smith's suppression motion, Investigator Herndon returned, once more, to the Baden area to focus on and photograph 716 Baden. Using the operations plan and other information available to the defense, Investigator

Herndon tried to capture what Detective Walls might have been able to see from the parking lot on the day of Smith's arrest by taking photographs and obtaining video recordings of the parking lot and alley. *See* Deft. Exhs. H & J.

At the evidentiary hearing, Investigator Herndon testified that, based on his observations, there was no place on the parking lot where officers could have safely viewed the back doors of 716 Baden without being seen.[2] Investigator Herndon also testified there was only one spot on the parking lot where he could see down the alley at all and, even from that vantage point, he could not see the back doors of the residences in question.

After the evidentiary hearing, Investigator Herndon made a fourth visit to the Baden area. While there, he took several additional photographs from the purported stake-out location Detective Walls identified on a photograph during the evidentiary hearing. *See* Deft, Supplement to Suppression Hrng. (Doc. 50). Smith submitted Investigator Herndon's post-hearing photographs as supplemental evidence but stated he did not "wish to reopen the hearing." *Id.* at p. 2. Consequently, neither Detective Walls nor Investigator Herndon were questioned regarding the supplemental photographs submitted after the evidentiary hearing.

I found Investigator Herndon to be a credible witness. However, his testimony has little or no probative value on the issue of Detective Walls' vantage point on the day of Smith's arrest. At no time did defense counsel confront Detective Walls with the photographs or videos Investigator Herndon testified about. As such, Detective Walls was never asked if the photographs or video taken more than a year after Smith's arrest accurately depicted the scene on

---

[2] This testimony was consistent with Detective Walls' testimony that he was seen by people who appeared to be acting as lookouts. *See infra,* at p. 3.

the day of Smith's arrest.[3] On cross examination, Investigator Herndon readily acknowledged that his first visit to the area occurred more than a year after Smith's arrest and he could not say that the photographs accurately depicted what the residences looked like on the day of Smith's arrest. Nor could Inspector Herndon say that the videos and photographs he testified about accurately captured Detective Walls' vantage point on March 9, 2022. Investigator Herndon also acknowledged that the area underwent physical changes (e.g., barricades were erected) and homes appeared to be in the process of being fixed up during his visits to the site in April, June, and August 2023. For these reasons, I give little weight to Investigator Herndon's hearing testimony and give little weight to the photographs and video taken before and after the evidentiary hearing.

Based on the record before the Court, the undersigned finds it is entirely plausible that Detective Walls was able to observe cars stopping at and entering the backyard and back entrances of 716 and 718 Baden on the day of Smith's arrest. However, Investigator Herndon's testimony and related exhibits suggest Detective Walls's view of the backdoors of 716 and 718 Baden may have been partially obstructed by the privacy fence and foliage, if any, on the day of Smith's arrest.[4]

## CONCLUSIONS OF LAW

Smith argues police violated the Fourth Amendment by seizing him without sufficient probable cause or reasonable suspicion that he was engaging in criminal activity.  The Fourth

---

[3] Indeed, when Detective Walls was presented with a Google Maps image of the area during cross examination and asked if the image was a "fair and accurate depiction of what the area looked like around the time of Mr. Smith's arrest" he testified "I don't remember much street coverage at all . . . I do not remember trees." Hrng. Tr. (Doc. 49), p. 36.
[4] The undersigned notes that neither the Assistant United States Attorney on direct, nor Smith's attorney on cross asked Detective Walls if he had an unobstructed view of the back doors of 716 and 718 Baden.

Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It is well established that "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment." *United States v. Gunnell,* 775 F.3d 1079, 1083 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Wren v. United States,* 517 U.S. 806, 809-10 (1996)). However, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

Reasonable, articulable suspicion that criminal activity is afoot requires a showing that "the officer's suspicion [is] based upon particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Jones,* 269 F.3d 919, 927 (8th Cir. 2001). In determining whether a police officer had reasonable suspicion of criminal activity, the court must "look at the totality of the circumstances, allowing officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Harvey,* 1 F.4th 578, 581 (8th Cir. 2021). *See also United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop."   *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004).

Here, based on the totality of the circumstances, Detective Walls had a particularized suspicion that criminal activity was afoot when he directed officers to conduct a traffic stop of the Buick in which Smith was a passenger. Specifically, before initiating the traffic stop, Detective Walls learned from an informant (previously known to the detective to be a reliable informant) that one or more people in the 700 block of Baden were selling drugs from the alley south of Baden. Indeed, information from a confidential source can provide sufficient objective justification for an investigative stop. *See, U.S. v. Newell*, 596 F.3d 876, 878 (8th Cir. 2010). Even an anonymous tipster, if reliable under the totality of the circumstances, can provide a sufficient basis for a Terry stop. *See U.S. v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001) (affirming denial of motion to suppress where stop was based on 911 caller's anonymous tip).

Here, the confidential informant was not an anonymous tipster. The informant was known to Detective Walls and had proven reliable in the past. In any event, Detective Walls did not rely exclusively on the tip but instead conducted his own investigation by using the street moniker the informant gave him to try to identify a specific address for the suspected drug house. Using the information from the confidential informant, Detective Walls identified a specific residence—708 Baden—associated with the individual the informant advised was selling drugs. Detective Walls then developed an operations plan designed to conduct surveillance of 708 Baden and to stop suspected drug purchasers to further their investigation or, if necessary, arrest the drug purchasers.

Detective Walls subsequently developed a second target address—716 Baden—as an address from which he suspected drugs were being sold. On March 9, 2022, Detective Walls and a team of officers responded to the area around the 700 block of Baden to execute the operations plan. While doing so, Detective Walls observed activity that was consistent with information

9

provided by the informant about drug sales from the alley, and that was consistent, based on his experience, with drug purchases. While observing this traffic in the alley, Detective Walls observed the Buick in which Smith was a passenger enter the alley and stop behind 716 Baden. He observed Smith exit the Buick and enter the privacy fence around 716 Baden. He testified he saw Smith enter the rear door of 716 Baden and, after approximately three to five minutes, Smith re-emerged and got back into the Buick. At that point, believing Smith had purchased drugs from 716 Baden, Detective Walls directed other members of his investigative team to initiate a traffic stop of the Buick.

The Eighth Circuit has long recognized that officers can, without violating the Fourth Amendment, conduct an investigative stop after a suspected customer/trafficker leaves a drug house. The Eighth Circuit's decision in *United States v. Pounds,* 70 F.4th 1106, 1108 (8th Cir. 2018) is instructive. Investigators in *Pounds* received information from a confidential informant that drug dealing was occurring at a particular residence. *Id.* Investigators conducted surveillance and observed a "significant amount of short-term traffic of the sort that experiences officers knew was typical for a location where drugs were sold." *Id.* Investigators saw the defendant, who was previously unknown to investigators, pull up to the residence and leave six minutes later. Investigators then radioed a patrol officer who pulled over the car leading to the seizure of methamphetamine. *Id.*

Considering the totality of the circumstances, including defendant's short-term visit to a suspected drug house, the Eighth Circuit held that because officers had a "particularized and objective basis for suspecting the particular person stopped of criminal activity," there was no violation of the defendant's Fourth Amendment rights. *Id.  See also United States v. Collins,* 883 F.3d 1029, 1030 (8th Cir. 2018) (no violation of the Fourth Amendment where detectives had

conducted buys at a residence and observed heavy traffic to the residence); *United States v. Piedra*, 170 F. App'x 19 (8th Cir. 2006) (controlled drug purchase in progress, as well as fact that Defendant had entered and left a residence where another drug purchase had occurred eleven days earlier, warranted investigative stop); *United States v. Buchannon*, 878 F.2d 1065, 1067 (8th Cir. 1989) (there was probable cause to detain purchaser who went to drug house, carrying a bag and departing a short time later, in a manner that conformed to the patters of the drug trade). In this case, as in *Pounds,* the officers had reasonable particularized suspicion that the defendant, who was previously unknown to them, had just purchased drugs from a suspected drug house.

Smith argues Walls's testimony about the informant and Walls's testimony about what he observed on the day of Smith's arrest was not credible and should be excluded from the "totality of the circumstances" considered by this Court. However, considering the credibility findings discussed above, the Court rejects this argument. For the reasons discussed above, the Court credits the testimony of Detective Walls and the facts and circumstances leading up to Smith's arrest.

Even if the Court were to ignore Walls's testimony, by Smith's own admission to Investigator Herndon, he stopped at 718 Baden on March 9th. If Smith visited 718 Baden and not 716 Baden as Detective Walls testified, this mistake of fact does not necessarily deprive the traffic stop of the level of reasonable suspicion required under the Fourth Amendment. "[R]easonable suspicion of criminal activity can be based upon a mistake of fact so long as that mistake was objectively reasonable." *Williams v. Decker,* 767 F.3d 734, 740 (8th Cir. 2014) (officer's mistaken belief that driver of a car was drinking alcohol was objectively reasonable and supported investigatory stop where it was undisputed passenger, who was near the driver, was drinking alcohol from a container wrapped in a paper bag and the car was parked at an angle

across two parking spaces). *See also United States v. Payne,* 534 F.3d 948, 951 (8th Cir. 2008) (finding mistake of fact to be objectively reasonable based upon difficulty of discerning visually whether a traffic infraction incurred).

In this case, even if Detective Walls was mistaken, when the totality of the circumstances are considered, it was objectively reasonable for Detective Walls to believe Smith had been "served" at 716 Baden—the suspected drug house. Based on the photographs submitted by Smith, 718 Baden is in very close proximity to 716 Baden and the two houses even appear to be enclosed by the same privacy fence. The photographs and video evidence submitted also suggest that Detective Walls's view of the back doors of 716 and 718 from the parking lot area may have been partially obstructed by the privacy fence and possibly foliage. Finally, Smith in no way attempted to rebut Walls's testimony that he was a passenger in the Buick or that his stop (whether at 718 or 716 Baden) lasted no more than a few minutes. As such, the Buick's stop behind 716 and 718 Baden had the hallmarks of a suspected drug stop as described by Detective Walls, (brief stop in very close proximity to a suspected drug house, entry from the alley, etc.). These facts, taken together, support a finding that, to the extent Detective Walls was mistaken in believing Smith entered 716 Baden, the suspected drug house, that mistake was objectively reasonable under the circumstances.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's motion to suppress evidence (Doc. 39) be **DENIED**.

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time

for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Trial in this case will be set by separate order before the **<u>Honorable Sarah E. Pitlyk.</u>**


SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated: November 30, 2023.